May it please the court. Before I begin the argument, I'd like to report that Mr. Olson and I conferred before the argument and with respect to the redactions that are in the brief, all parties agree that the oral argument can refer to anything in the record regardless of the confidentiality designations and the panel can refer to such material in its opinion without redaction. Yeah, I had a problem with the redactions. They covered quotes from cases and all sorts of stuff. I think you need to be careful not to do that. And since you've agreed that the redactions aren't necessary, I think you should file public copies of the brief that include all the material. That's very well, Your Honor. We complied with the protective order that the judge had entered. The material that was redacted, just so that you know, was most of the material that was submitted prior to the trial was submitted as confidential under seal and the court's pretrial rulings that disposed of a number of the issues were similarly sealed, but we will file such a public notice. It probably shouldn't have been sealed at the district court level and one of you must have requested that. I can tell you that it was not me because I wasn't in the district court, but both each side requested confidential treatment during the pretrial proceedings for proprietary information. And similarly, I gather with respect to the enhanced damages issues, but I wasn't counsel. You may well be right. We're simply Yeah, the problem is it's hard to see why any of these redactions are proprietary information like quotes from arguments that were made, quotes from the district court. In any event, you've solved it. Why don't we move on? I certainly hope that I'm not going to use my argument. I'm defending this. In any event, we've agreed. Now, with respect to my argument, this case, this appeal raises several significant issues going both to the merits that is validity and infringement and to remedy that is awarding lost profits to a company that sold no products and upholding a willfulness finding notwithstanding an obviousness defense. Why don't you jump right into the merits? Let's talk about written description and adapted to enter a group. Very well. Tell me where the district court erred in granting summary judgment, dismissing the Medtronic defense of no written description. Well, the adapted to enter a group limitation of claim one was added three or four years after the patent application was filed in order to overcome several prior rejections. And there is nothing whatsoever in the written description of the patent either as filed, the PCT application filed in 1999 or the national application filed in June of 2002 or even adding the column and a half of new material. There is nothing whatsoever that describes adapted to enter a group. Counsel, your expert testified in his report while cutting groups for anchoring positions was known in the art at the time the patent was filed, there's no description. Do they have to describe everything that's well known to those of skill in the art at the time in order for it to satisfy the written description requirement? Well, as this court has explained most recently on Bank and Ariadne in your opinion for the panel in ICU medical, the written description requirement does prior art doesn't overcome the function of the written description requirement and more to the point. Which is possession. And so why isn't possession test satisfied where something is well known to those of skill in the art? I mean, it's I'm simply that this court on Bank and Ariadne said, quote, if the claim if the claimed invention does not appear in the specification, the claim fails regardless of whether a person of skill in the art could make or use. You're saying that information available to someone skill in the art is irrelevant to what has to be in the specification? With respect to the written description requirement, not enablement, but the written description requirement, this court has said repeatedly that it serves not only a possession function, but it serves a signposting function. In Ariadne and in ICU medical, you quoted the statement in Rochester that said the purpose of the written description requirement is to ensure that the scope of the right to exclude as set forth in the claims does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification. Let me ask you an example. Suppose that in my specification, which is to a very complicated invention, there's one aspect of the invention I talk about joining two parts of it together with a screw. During prosecution, I cancel my claims, I amend them, and instead of saying screw, when my newly filed claims say fastener. Well, everyone of skill in the art knows a nail will work just as well as a screw in this invention, assumed from a hypothetical. This is not an important part of this invention. This is ministerial and insignificant, has nothing to do with the novelty. But the spec never mentioned the word nail, and in fact, in the preferred embodiment, the only disclosure was in fact a screw. Are we going to say written description prevents you from using the word fastener in your claim because the only thing in your spec was the word screw? No, this is not a case in which the specification identifies, describes a species and there is a broader genus claim. With respect to the adapted to enter a groove, there is nothing whatsoever in the specification that goes to that claim limitation, which was added at 11.59 p.m. Mr. Waxman, in your view, what should it say? Well, we argue to the judge in the Markman hearing that it was indefinite as opposed to lack of... Now, what should it say? Tell me what was missing. How would they satisfy the written description requirement? What were they required to say? If you look at the 477 application, which was Dr. Marnay's earlier application, there are figures that show the grooves. There are figures that show how the anchors engage with the grooves. There are paragraphs of description about how the grooves are cut and several figures that show the tools and explain how it's done. There's no doubt that everybody skilled in the art... So you're suggesting that there has to be some description of which grooves and how to cut the groove? Whether there is a groove or not. For example, there was no dispute in the record that persons of skill in the art understand that protrusions in metal prostheses that attach to bone can either be self-cutting, that is, they're simply pressed into the bone, or they can slide through a groove. Everybody in the art knew that either could be done. And by the same token, any protrusion, whether it's a spike, a peg, a keel, a rod, whatever, certainly can be slid into a groove of some sort. But there are all manner of grooves that will not really affix a protrusion and vice versa. And the point here is that both SSI and the judge, with respect to this issue, said two things. They said, well, the 477 specification... The problem here is that it says adapted to enter a groove or whatever it is. It doesn't say what kind of groove. It doesn't say where the groove is. It sounds as though you're asking for specificity that's unrelated to the claim language. Our point with this, and I think we of course have another written description failure with respect to operative engagement that I'd like to address, but our submission on this is only this. There is nothing. We take Ariad and this court's other written description requirements seriously. The 477 patent, and indeed the patent application for our OMAP, has pictures showing the fixation, pictures showing the grooves, and explications for how it's cut. This was thrown in following, I think, three, four, five rejections. This was the last amendment that procured the allowance by the examiner. There is nothing in the written description at all. Forget inadequacy. There is nothing at all, and their whole defense was... The problem is this. We're not dealing with a process claim that talks about cutting a groove or achieving it. It just says that this anchor has to be capable of entering a groove. It doesn't say where the groove is or what the particular groove looks like. It just says a groove. So why wouldn't... I mean, surely people skilled in the art know what a groove is. There's no doubt that people skilled in the art know what a groove is, and I think the only thing I can say, and we'll rely on our submission here, is that the anchor, no matter... I have no idea what adapted to enter a groove means. We told the judge when they sought claim construction of this term that the term was indefinite and there was no written description in it. There is no such thing as a protrusion that can't be adapted to enter a groove. I mean, what I'm having trouble with is I don't understand how the protrusion is adapted to enter a groove that hasn't been cut yet. I mean, it's so confusing to me. We didn't even... Why doesn't it just presuppose a groove? I mean, adapted to enter a groove, why don't you just say that presupposes... I could make a groove that is five millimeters long and three millimeters wide with a protrusion that is one millimeter long and a half a millimeter wide, and it wouldn't serve any anchoring function at all. What's missing from this specification is exactly what Dr. Marnay put in the 477 application. In their entire defense, and the basis for the judge's ruling, is that the 477 specification was incorporated by reference, which it certainly was not under this court's case law. But even putting that aside, there is still testimony by your own experts that supports the notion that someone would know what a groove is and how to put something into a groove. It may be that there are particular grooves or particular types of grooves that are unknown that would have to be described. That may be what was happening in the 477 application. But here, all it says is adapted. Adapted, that is, the anchor to enter a groove. It doesn't say anything about what kind of groove. That's your problem. Well, I think that that's their problem. This was the limitation added at the very end of a very long prosecution following multiple rejections for obviousness on the anchor that procured the issuance. I will rest on my argument on the papers with respect to adapted to enter a groove, but take the liberty of continuing on written description to operative engagement, where I think, again, the failure of written description here illustrates so clearly how SSI rendered its patent invalid when it copied its claims to try and cover Medtronic's products. When Dr. Marnay applied for this patent, he expressed as its object an improvement on the prior art by, quote, minimizing the structural height of the intervertebral implant upon insertion. And the specification explained that this can be accomplished only with a device that has two plates that are flat and are designed to inter-nest with each other for purposes of insertion between the vertebrae. And then a third piece, which it calls a pivot insert, that is then thrust in between the two plates once they are in place to provide operative engagement between the pivot insert and the upper part. Nowhere in the specification filed in the application, in the PCT application, or the original national application, or even the column and a half of new material that was added years later in the specification, does the specification permit even the suggestion that it disclosed a two-piece device in which the upper plate and the lower plate do not nest with each other, the structural height is not minimized, and there is no pivot insert. To the contrary, the application goes out of its way to disparage that structure. There's no pivot insert, but your product pivots. Yes, our product. It goes into the thing and it pivots all around, all three of the examples. Exactly right. And we've lodged with the court the accused devices in this case, and you can readily see by reference to those devices, they pivot just like the embodiment of the 477 patent pivots. That is, the two pieces, the ball and socket joint, which was well known in the art, performs the function of operative engagement in our device, just as it did in the embodiment of the 477 patent, but there is no way that the top piece and the bottom piece can internest for purposes of insertion in order to accomplish the inventive aspect of this patent, which is to reduce the structural height of the device when it's inserted in between the patient's vertebrae. In fact, in column one of the specification, this patent application disparages this very two-piece device that is ours and Dr. Marnay's ProDisc 1, which is the embodiment of the 477, by saying that, and I'm reading from column one, in two-piece intervertebral implants, difficulties arise because these parts can be inserted only by widening the intervertebral space greatly. Not only is this difficult, but it also presents the risk of injuries. And the inventive aspect of this entire application was the creation of a structure, and I did not lodge with the court the ProDisc 2, which is the embodiment of the Marnay 071, because we only have one copy, but the way it works, it's in the record, the way it works is you have two flat plates that when they, without the pivot insert, they have protrusions and recesses that match up, and so when it goes in between the spine, the vertebrae, it's very, very small. And as the 071 specification explains, there are holes in the end that are right next to each other when they're internested, and once it's in, you take a device that sticks into these holes and separates them out, and then this pivot insert is stuck in to provide the operative engagement. And so when they asked for a construction of operative engagement, we said to the judge, the only operative engagement that is disclosed in this specification is pivoting, or operative engagement, between the pivot insert once inserted and the lower part of the top plate. And if you construe operative engagement any more broadly than that, the patent will fail for lack of written description. Lack of written description precisely of the type this court identified in ICU and Tronzo and Gentry Gallery, where not only is there nothing, nothing in the specification that discloses a two-piece device other than to disparage it, but there is actual disparagement of operative engagement using anything other than the third piece, the rounded pivot insert. Your time has expired. You've got any final quick point that you want to make? Well, we obviously think we have a very strong obviousness point. It's, I think, pretty well laid out in the briefs. And of course, with respect to, I'm happy to answer questions with respect to the lost profits issue, the non-infringement of the OMAV. If my time has expired, I really only want to answer questions from the court. Yes, sir. We'll give you two minutes for rebuttal. And let's see, extend the time for Mr. Olson by two minutes, Olson. Thank you, Your Honor. It may please the court. With regard to the issues in this case, the statement was made that there were a number of significant issues raised in this case. I don't believe that there are any particularly significant issues raised by this case. Really? I don't. In my view, Your Honor, with regard to what we have here is a jury verdict on the issue of obviousness. And substantial evidence is never contested by the other side with regard to the overwhelming evidence that the jurors received. Well, let's start with standing. Sinspine doesn't have any. Sinspine is a sister corporation which has no exclusive license, either oral or written. How did they get in as co-plaintiff? If they're not in as co-plaintiff, you don't have a right to lost profits. On that particular issue, the district court found that there were exclusive rights in the motion and limited determination before trial. On what basis? The judge concluded, and he relied on the Donahoe testimony, that there was exclusive rights to make. There was no written assignment of exclusive rights, right? There was no written agreement. There was no oral agreement assigning exclusive rights, either, correct? There was an applied agreement between these entities. And this court has said, with regard to license agreements, those agreements can be applied. That law is not contested by counsel. Suppose we reject that. Then you lose on lost profits, right? No, Your Honor. Absolutely not, even if this court changes the law on an implied license. Because it's not contested that they had exclusive rights to make. There was a complete waiver as to SSI's right to recover lost profits. In the WMS gaming case, it didn't mean a waiver of the right to recover the lost profits. You mean a waiver of the right to challenge it. No? Well, what that case goes is, when you have a bunch of sister companies, related companies, the defendant can waive the right of one of these companies to collect lost profits on behalf of all of them. That's the corporate distinctions argument. And we asked, why didn't it, right at the very beginning interrogatory, we asked, why does SSI not have the right to recover lost profits? And they never, never, ever, in that interrogatory response, or ever supplemented that response that said SSI didn't have a right to recover. Well, wait a moment. I mean, it's your job to establish your right to recover lost profits. You moved late in the case to add these other companies as plaintiffs here, right? Well, we did when the- And they objected to that. They objected to the idea that you had standing at that point. Isn't that correct? Well, our position was that SSI had had, we said SSI in the expert reports, and their expert reports didn't contest this issue. We went all the way through, past the close of discovery, with the argument that SSI had a right to recover. Why did they have to raise it? I mean, it's up to you to establish the right to recover lost profits. Why is there a waiver? Because they didn't argue that until the trial. Because, Your Honor, there was unquestionably lost profits here. There was sales, there was manufacturing that was lost to the Synthese families of companies, and SSI sought to recover those lost profits on behalf of the family of companies. That issue can be waived by the defendants. It's not a standing issue. It's simply an issue, do you want to assert that defense, or do you want to not assert that defense? It's not an affirmative defense. It's part of your burden to establish the right to recover lost profits. And we set forth all of the lost profits that the Synthese family of company had lost. They were all lost. And the only argument that we made was that Spine Solutions should be entitled to recover those lost profits. And we asked them, do you have any objections to Spine Solutions recovering those lost profits? And they said, no, we have no objection. Effectively, that's what their interrogatory response is. Where did they say that? Because we said, is there a page? What page? Where did they say we have no objection? Well, it would be in the, I'll get you the citation, but it's in their interrogatory response. It was never supplemented. Well, I don't recall reading an interrogatory response to that effect, or having something quoted in the brief. If there is, I'd like to see it. Yes, Your Honor, we will find it. On the point of willfulness, under Seagate, if they have a very strong defense, if I were to be really sitting here flip-flopping back and forth on whether they should prevail on one of these defenses, wouldn't that be sufficient basis to conclude there's no willfulness under our standard announcement in Seagate? Well, I mean, willfulness is an issue of fact. And the question here, I think, is whether there was substantial evidence to support the willfulness defense. And I believe that there was more than substantial evidence to support the willfulness defense. But under Seagate, it doesn't have to be strong. It just has to be reasonable. In order to satisfy the objective test of Seagate, you would have to show that they had asserted an unreasonable case, a reasonable defense, correct? Correct. So here we have a situation in which the judge, in dealing with the enhancement, says that their position was reasonable. So if he found the position was reasonable, how could the jury have found that it was unreasonable? Well, at the first level, even if it's true, and the judge was talking about, on the issue of enhancement, whether their position was frivolous. And he said it wasn't frivolous. Since it's an issue of fact, even if the judge concludes, in his own mind, and we don't know this because he's evaluating this in the enhanced damages situation, which is a different standard than in the willfulness standard, he can't substitute his belief for the jury's determination. The jury here determined, as a matter of fact, that there was willfulness, based on the evidence that was presented. And the issue for Judge McCollough was whether there was substantial evidence that supported the willfulness. Suppose we look at the record, which is what Seagate tells us to do, and we say, well, yeah, this was clearly a reasonable defense. Then we have to set aside the willfulness for it, don't we? I don't think. No, what I think that the court is required to do is determine whether there was substantial evidence of the willfulness. Substantial evidence to find that it was unreasonable. Wouldn't you be saying, we have to presume that the jury found it was reasonable, and so what we need to do is look to see if there was substantial evidence to find that was a reasonable defense. You presume the jury found it unreasonable. I think that's perhaps one way to choose it. To support the jury's finding that it was an unreasonable defense. I think that's probably, Your Honor, that's one way to take a look at it. But remember on the obvious, the only issue presented to the jury, and that was their choice, was the issue of whether our defense was reasonable based on the obviousness. Remember, in this case, we have a situation where they filed for their own patent application on this subject, and obtained a patent because they didn't cite to the patent office our application. And so they obtained a patent that related to this single field. That's the 118 patent. They also, after the case was filed, they weren't selling the United States because they didn't have FDA approval. They were only selling outside the United States, but they continued to make the product in the United States. And they told the district judge, well, we can easily move the manufacturing overseas, but they continued to manufacture the product in the United States. They've now moved it overseas. I'm lost. I'm lost. I don't understand what that has to do with the jury's determination of obviousness. Oh, this is on willfulness, Your Honor. OK, I'm sorry. I thought that you were talking about obviousness. Yes, on willfulness. That the jurors had plenty of evidence from which to conclude that Medtronic acted objectively reckless. In other words, that the obviousness defense was false. That Medtronic didn't even believe in their own obviousness defense. Well, it's not a question of whether they believed in it. That's the subjective part of Seagate. It's a question of whether it was objectively reasonable. And I'm saying is that it can be considered objectively unreasonable based on the evidence, including the evidence that Medtronic showed its own patent application on the subject. And that was eventually issued by the Patent Office. And then later, after we had obtained our patent in a continuation application, they admitted to the Patent Office that it wasn't an invention. They didn't have to. They tried to provoke an interference, and all they had to do was say they were copying the claims. But they went even further and said that it was an invention. That sounds like the subjective part of it. Let me move you to the injunction. This injunction seemed to be a problem to the extent that it bars sale of these devices outside the United States. How do you justify that? Your Honor, Judge McCullough entered an injunction. An appeal was taken on that. This Court modified that injunction. I don't have any problem with the modification of that injunction at this point in time. Who to eliminate that part that bars sales outside the United States? If they're manufactured outside the United States, Your Honor. No, no, no, no. No. The problem is that there appeared to have been devices that were manufactured in the United States in violation of the patent, shipped abroad, and now the injunction says you can't sell those. And if I understand correctly, you did not seek damages on those items. That's not part of the damages award, correct? We sought damages on any product that was manufactured in the United States. Any product that was manufactured. So you recovered damages for those items? Correct, Your Honor. If they were made in the United States, we argue that that was an infringing act and we asked for damages. So how can you enjoin the sale of them if you've already recovered the license fee for them? Oh, we're talking about future activity, Your Honor. The injunction going to future activity. But future activity for items as to which they've already paid a license fee as part of the damages award. And that's the part that we are not pursuing here at this point in time to the extent that there have been products. They don't have any more product that were made in the United States, located in the United States. They've all been shipped overseas prior to the injunction. We're not asking any more for that injunction as to those products. They can go ahead and sell those products. So you're agreeing that the injunction should be modified to delete the bar against sale outside the United States for previously manufactured items? Correct, Your Honor. Let me come back to just this issue, though. I want to address on the lost profits issue. And that is, with regard to the WMS gaming case, the issue that the district court resolved after the trial was whether Spine Solutions had made an argument that they had a right to recover. The defendant had ever objected to Spine Solutions' right to recover. In fact, waived that argument. After the trial, in the judge's JMOL opinion, he essentially said that there was a waiver by the defendants of the right to recover, Spine Solutions' right to recover. He wasn't going to address it because of the pretrial conduct. This is not a standing issue. This is a total waiver issue. In their opening brief on appeal, they did not raise that issue. They did not argue that there wasn't a waiver. We pointed that out in our opposition brief. In the reply, that's when they came in with four pages of argument as to why there shouldn't have been a waiver. The court shouldn't have found a waiver. Counsel, can I turn you to the written description argument, please? In particular, the adapted to enter a group. Doesn't our case law say that absent incorporation by reference, what is disclosed in references that just happen to be cited in the prior art, does not satisfy the written description requirement? I think that's a fair statement, Your Honor. So I think that the district court may not have gotten at least the rationale correct then for the written description of adapted to enter a group because the district court relied on the 477's disclosure as providing the necessary disclosure that ought to be in the patent. Well, it's slightly. And it's a fine line, Your Honor. But with regard to the 477, a couple of things. Obviously, it's the same in Venn. Two, the 477 is referenced extensively in the 071. But I think the more important issue for this court is, and I think the easier issue for this court, is that with regard to this adapted to enter a group, there's sufficient disclosure in this patent. One of the things that we don't hear from the other side is any actual discussion about the patent except this disparagement comment. Can you show me? I have my patent here. Tell me what column, line number, and what figure the patent discloses adapted to enter a group. Two things that I think are important here is that, and this goes actually to both of the written description issues. This patent talks about that the objective here is to have minimum structural height. And that is to make it easier to insert the intervertebral implant. Then they go on and they say. I need a page number, a column number, a line number, please. Where I just started is column one. And that's around line 53, something like that. Then what this patent is, it gives a number of ways. Dr. Monet was obviously a physician. And he was attempting to try. Line 53 is just about being advantageous or an object of the invention to have a minimum structural height. To make it easier to implant. And then he talks about. Having a minimum structural height to make it easier for implant. What does that say about adapted to fit in a group? What I'm saying is that. Then he talks about. Who's he? I'm sorry. The inventors talk about in column one around line 30. That even in a two-piece intervertebral implant, difficulties arise. Because with pins and whatever, the vertebrae has to be spread. So you don't want to have to spread the vertebrae for pins. And so. This is very confusing. I mean. Adapted to enter a groove. It sounds as though we're talking about. A description of part of the anchor. Which has to be adapted. So it can enter a groove in the vertebrae. Right? Right. The figure shows the single keel. If you go to column three. At line 56. It says. The upper part. Is embodied flat on its top. Thus creating a support face five. On which various kinds of protrusion. Six of it are disposed. Which serve the purpose of anchoring the upper part. In a vertebrae that rests with its end face. Toward an intervertebral space. On the support face. So this implant. What he's talking about here. Is with regard to this implant. You have this. This support face. That rests against. The intervertebral. The intervertebral body. And you have a support face. That rents. Rests against it. And you have a keel. That's clearly shown in every figure. A single keel. That's shown in every figure. And that's where the vertebrae is. Because you have a support face. On the implant. That's resting against the vertebrae. So clearly. The keel. Has to fit. Within that vertebrae. And obviously. It's going to fit within. Within a group. You say obviously. But you know what. Our written description case law. Is really crystal clear. That obviousness. Is not enough. It's Drader's case. Enzo or Eli Lilly. One of the E cases. It was a. Sorry. Use of that word. Your honor. But the point was. Is that. That those skilled in the art. All agree. Every one of those skilled in the art. There was no contested issue of fact. That those skilled in the art. Recognize. That you could. You could cut a groove. Or you could form a groove. And. If the implant. Is going to rest. On the face. Of the vertebrae. You don't even have to be. One skilled in the art. In the word. Obviously. Because even to. Me. Not one skilled in the art. If you're going to have a support face. Rest against the inner. In vertebrae. And everybody knows. How to cut a groove. And. The patent shows. That there's a substantially. High keel. That. That. Rises above the support face. That's. That. That keel. Is going to go in. To. The vertebrae. The adjacent vertebrae. So it's going to go. Into that groove. So I believe the fact. That this. There is this language. In here. Is. Establishes. That the keel. Is. Goes into that group. Thank you. Thank you. Mr. Three points. First. With respect to. Lost profit. I know there's so much. You want to address. My. I need you to go back. To a written description. Of anchoring. Trust me. We've read your briefs. And everything. So could you just focus. On that for me. I. Richard. Description. Of anchoring. Yeah. The written description. Of the anchor. Adams. Anchor. Being adapted. To enter. The group. I know you've tried hard. But just try one more time. With me. So. So the only. The only. Just if you look. In the specification. The only. And and. For written description. Purposes area. Confirms we're talking. About the specification. As of the. Priority date. Claimed. Which was the application. That was filed. Without the column. And a half. Of new material. Although. There's nothing in that. Either. As to that. The original specification. Says. And. I will. I will. Get my patent. As ready. As you have. Yours. It says. That. The only thing. That it says. Whatsoever. About anchors. Is. On. Here. It is. On. On. On. In. Column. Five. Lines. Fifty. Nine. Through. Sixty. One. It says. That. The device. Has. Their. Quote. Various. Kinds. Of protrusions. Quote. Which serve. The purpose. Of anchoring. That is. It. I mean. One. Of the. Many. Anomalies. About. This. Case. Is. That. At. The time. Dr. Marnay. Filed. His. Application. He. Said. There. Is. One. And. Only. One. Advance. Here. Over. Prior. Art. And. That. Is. The ability. To. Intermess. The two. Plates. He. Didn't. Even. Mention. Wait. Wait. But. The. Point. Is. People. Knew. What a. Groove. Was. Right. There's. No question. Absolutely. Absolutely. Sure. So. Adapted. To enter. A groove. Just. Means. That. The. Anchor. Has. To. Be. Formed. In. Such. Way. That. It. Could. Enter. A. Groove. Right. Judge. Dyke. There. Is. No. Way. No. Way. That. Any. Limitation. To. Obtain. Patent. Ability. And. They. Didn't. Include. Any. Written. Description. To. Support. It. That's. Our. Case. I mean. The. Fact. Of. Them. In. There. Before. Point. One. And. But. The. This. Is. I mean. This. Is. The. Classic. Example. Of. The. Kind. Of. Written. Description. Failure. That. The. Court. Has. Identified. Repeatedly. Where. There. Are. Claims. That. Are. Different. What. It. Is. That. They. Finally. Amended. Their. Claims. To. Do. In. Order. To. Try. To. Cover. Our. Device. After. They. Saw. It. From. What. They. Had. Originally. Made. First. With. Respect. To. Lost. Profits. You. Asked. Where. Did. The. Judge. Find. That. There. Was. An. Implied. Agreement. Page. A. 178. Page. 178. Of. The. Appendix. The. Judge. Never. Found. That. There. Was. An. Agreement. Oral. Written. Implied. Or. Expressed. And.  Never. Waived. Any. Rights. With. Respect. To. S. S. I's. Ability. To. Recover. Lost. Profits. In. Fact. We. Didn't. Know. That. S. S. I. Neither. Made. Nor. Sold. Until. We. Filed. A. Motion. To. Compel. Their. Thirty. B. Six. Witness. To. Answer. That. Is. A.       Six.       Motion. To. Compel. Their. Thirty. B. Six. Witness. To. Answer. That. Is. A. Motion. To. Compel.              Their. Thirty. B. Six. Witness. To. Answer. That. Is. A. Motion. To. Compel. Their.                 Thirty. B. Sixty. A. Motion. To. Compel. Their. Thirty. Three. B. Sixty. Four.